# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JOSEPH JOHN OKA, ) | |
| ) | **Case No. _____** |
| *Plaintiff,* ) | |
| ) | |
| v. ) | **COMPLAINT** |
| ) | |
| AIR LINE PILOTS ASSOCIATION, ) | |
| INTERNATIONAL ) | |
| ) | |
| ) | **JURY TRIAL DEMANDED** |
| *Defendants.* ) | |
| ) | |

## COMPLAINT

Plaintiff JOSEPH JOHN OKA ("Plaintiff") brings this action against Defendant AIR

LINE PILOTS ASSOCIATION, INTERNATIONAL ("ALPA") and states as follows:

## INTRODUCTION

1. Plaintiff seeks relief from Defendant's pattern of discriminatory behavior against
   employees who hold religious objections to receiving a COVID-19 vaccine.

2. Plaintiff brings this action against Defendant ALPA for religious discrimination,
   disparate treatment, and retaliation under Title VII of the Civil Rights Act of 1964, 42
   U.S.C. § 2000e, et seq. ("Title VII").

3. United Airlines, Inc. ("United") implemented a COVID-19 vaccine mandate ("mandate")
   as a condition of employment for all employees that was tyrannical, coercive, and lacking
   in all scientific reasoning.

4. ALPA, as the union tasked with representing Plaintiff in the course of his employment,
   continuously discriminated against Plaintiff for exercising his religious beliefs and

1

seeking an exemption and accommodation on religious grounds from United's COVID-19 Vaccine Policy. ALPA discriminated against the Plaintiff while he sought relief from United's mandate and ensuing contract violations via grievance mechanisms.

5. ALPA retaliated against Plaintiff upon his return to work by failing to address Plaintiff's grievances regarding discriminatory policies against unvaccinated pilots, and particularly religiously exempt pilots.

6. Plaintiff now seeks all applicable legal remedies, including but not limited to injunctive and declaratory relief, compensatory damages, punitive damages, reasonable attorney's fees and costs, and any other available relief.

## **PARTIES**

7. Plaintiff Joseph John Oka is a citizen and resident of Kenton County, Kentucky. He was a first officer for United Airlines and a dues-paying member in good standing of Air Line Pilots Association, International at the time of the events giving rise to this action. He is currently employed as a Captain with United.

8. Defendant Air Line Pilots Association, International ("ALPA") is the largest pilot union in the world, representing more than 75,000 pilots from 43 U.S. and Canadian airlines. Its headquarters are in McLean, Virginia.

9. Defendant ALPA is a national labor union and was at all relevant times the certified collective bargaining representative under the Railway Labor Act for Plaintiff. 42 U.S.C. § 151, *et seq.*

10. Defendant ALPA was at all relative times the certified collective bargaining representative for Plaintiff, among other United pilots, under the Railway Labor Act for Plaintiffs. 45 U.S.C. § 151, et seq.

11. As a labor union, Defendant ALPA is a "person" as defined by Title VII and is subject to all applicable provisions of that statute, including those which prohibit discrimination and retaliation against its members based on protected categories such as race, color, religion, sex, and national origin.

12. Defendant ALPA is also a "labor organization" as defined by Title VII and is subject to all applicable provisions of that statute, including those which prohibit discrimination and retaliation against its members based on protected categories such as race, color, religion, sex, and national origin.

13. At all times relevant to this action, ALPA had and has more than 25 members.

14. At all relevant times, ALPA knew or should have known the laws, policies, practices, and conditions alleged herein.

## JURISDICTION AND VENUE

15. This Court has original jurisdiction over the subject matter of this dispute pursuant to 28 United States Code ("U.S.C.") Section 1331. Plaintiff seeks remedies under Title VII of the Civil Rights Act pursuant to 42 U.S.C. § 2000e et seq.

16. Venue is proper under 28 U.S.C. §1391(b)(1) because substantial parts of the acts or omissions giving rise to the claim occurred in this District.

17. An actual and justiciable controversy exists between Plaintiff and Defendant.

## FACTUAL BACKGROUND

18. In early 2020, a global response was initiated as a result of the spread of COVID-19.

19. United began implementing effective policies and practices to help stop the spread of COVID-19 to its workforce. Such efforts included the imposition of masks, gloves, and,

eye protection; maintaining distance from others; and participating in temperature checks prior to starting any shift or work assignment.

20. In January of 2021, ALPA took a position in support of mass vaccination in the airline industry, writing to Congress, "[t]here is no doubt an aggressive public vaccination campaign and strict public health precautions will ultimately restore confidence in air travel and revitalize our economy." *See* Exhibit 1. This position was in complete alignment with United CEO Scott Kirby's statements on the push for a vaccinated workforce.

21. From January 2021 to September 29, 2023, and all times relevant, Plaintiff, and other United pilots, were represented by ALPA. ALPA-represented United pilots were working under a Collective Bargaining Agreement (CBA) between United and ALPA – the 2018 United Pilot Agreement (UPA 2018) – that governed the pay, work rules, and working conditions of all United pilots from March 1, 2018, until its renewal.

22. Anticipating COVID-19 vaccine mandates and policies, ALPA assured its member pilots that their rights would be protected in its January 25, 2021, update on COVID-19 Vaccinations published by ALPA's United Airlines Master Executive Council ("MEC")[1], which represents more than 17,000 United Airlines pilots flying a fleet of 700 aircraft every day. It promised that:

> "ALPA will continue to work on your behalf to protect pilot health, safety, and careers…. Like the population at large, a very small number of pilots may be unable to receive the vaccine due to legitimate medical or sincerely held religious beliefs and ALPA will protect their rights."

---

[1] The MEC has no legal distinction from ALPA.

23. In admitting that employees seeking an exemption would require additional protection of their rights, ALPA recognized that those who sought exemptions to United's mandate would be threatened and subjected to discriminatory policies.

24. Throughout the Winter and Spring of 2021, ALPA continued to reliably assure pilots that their careers would be protected concerning the implementation of a mandatory COVID-19 vaccine requirement.

25. Despite these assurances, ALPA, without explanation, did the opposite and continuously supported and implemented policies and practices that were adverse to the group of employees that ALPA previously identified as vulnerable. ALPA directly targeted and discriminated against pilots who sought accommodation on religious grounds, versus pilots who sought accommodation on medical grounds.

26. As early as late 2020, ALPA and United Airlines worked together on accommodation packages that would benefit medical objectors – but not religious objectors – of impending mandates. Additionally, pilot Christa Strang reported evidence that at the highest levels of corporate management of both ALPA and United there was the consistent belief that religious requests for vaccine accommodations were fraudulent. *See* Exhibit 2.

**ALPA Aided the Targeting of Unvaccinated Pilots via United's LOA 21-02 Policy**

27. On May 25, 2021, ALPA presented United pilots with an agreement that the ALPA Negotiating Committee and United entered into referred to as Letter of Agreement (LOA 21-02) Vaccine Agreement. It was enacted purportedly to encourage voluntary pilot vaccination and to prevent the necessity of implementing a vaccine mandate.

28. ALPA had a principal role in the negotiation of LOA 21-02.

5

29. In establishing this agreement, ALPA stated that "[t]he … focus has been on encouraging maximum voluntary participation in lieu of any such mandate."

30. ALPA admitted that LOA 21-02 was purposely negotiated to: "get you down to a small group, we knew there would be a small group the company could deal with," implying it aimed to pressure as many employees as possible to receive the COVID-19 vaccine.

31. In a May 2021 email to all United pilots, ALPA's Negotiating Committee further expressed the prescient sentiment that pilots who asserted exemptions and thought they were going to "sit at home and get paid" were wrong. "Reasonable accommodation doesn't mean you can keep flying United airplanes without getting the vaccine or stay home and get paid if United issues a mandate." John Schleder, ALPA's Senior Labor Relations Counsel/MEC Coordinator, expressed this same sentiment to Plaintiff during an August 2021 phone call.

32. ALPA First Officer Representative and Vice Chairman Chris McCullough, Local Council 5, admitted that LOA 21-02 was negotiated by design to be harsh on vaccine objectors, stating: "We wanted just the carrot ($$) but they insisted on the stick as well. There had to be consequences for those who don't take the vaccine voluntarily. This LOA is the result."

33. LOA 21-02 functionally operated to encourage and incentivize vaccination by acting as a monetary reward for vaccinated pilots and to also effectively improve their seniority by having some senior pilots removed from bidding competition. Also, inherent in the combined features was material vaccination encouragement and opportunity for better trip awards and corresponding materially enhanced pay. Furthermore, LOA 21-02 enacted an additional punitive policy that adversely affected unvaccinated pilots,

especially the very pilots that ALPA assured in January that it would protect, by precluding them from bidding or trading for *any* substitute trips to replace a trip to a country designated as unavailable to unvaccinated pilots. Although every country but Iceland had exceptions to the vaccination mandate for crew members, United unilaterally designated many countries to where unvaccinated pilots were prohibited from flying. When unvaccinated pilots were assigned to those trips, LOA 21-02 prohibited them from replacing it with an allowed trip, resulting in loss of pay.

34. Unvaccinated pilots were assured of increased difficulty bidding and difficulty in schedule management along with partial seniority abrogation, combined with some lost opportunities and consequentially materially reduced pay and less favorable schedules, which departed from minimum pay guarantees in the UPA.

35. ALPA again admitted in March 2022 Grievance Review Panel[2] (GRP) hearings that it worked with the company to create the punishing effects of LOA 21-02 to cull the group of vaccine objectors down to a small group that the company could then "deal with."

36. LOA 21-02 was an admittedly targeted tool of discrimination against a group that was more than eighty percent (80%) religious objectors and had a disproportionately adverse effect on pilots who held religious objections to the COVID-19 vaccine.

37. As a religious objector to the vaccine Oka was harmed by LOA 21-02 through schedule restrictions and income.

38. Numerous United pilots objected to the punitive features of LOA 21-02. In response, ALPA uniformly rationalized the agreement, stating that the punitive bidding prohibition

---

[2] The Grievance Review Panel is an ALPA board consisting of three pilots selected by ALPA leadership that determines if a pilot's grievance that ALPA does not support is allowed to proceed to arbitration.

was because unvaccinated pilots would "game the system" by abrogating seniority they could hold by bidding vaccine destinations on holidays to get dropped trips. ALPA used this justification for anticipatorily enacting seniority abrogating punitive terms which also rewarded United pilots preferred by ALPA.

39. ALPA leadership was wholly dismissive of Plaintiff's and other pilots' concerns about LOA 21-02. Indeed, Plaintiff himself formally complained about the policy on numerous occasions.

40. In a May 27, 2021, in response to a United pilot's objection to the punitive terms contained in LOA 21-02 and mandated vaccination, in which the pilot referred to the Nuremberg Code, Chairman Insler contrasted the religious persecution of Jews to the pilots' objections and concerns derisively sharing with a fellow ALPA member, "Please let him know it's wholly inappropriate to compare Nuremberg to voluntary COVID vaccinations. When we round them up, seize their belongings and put them into trains to work camps then tattoo them with ID numbers, shave their heads, make them wear prison clothes, force them to do our labor, starve them, do actual vivisection experimentation, then poison or shoot them, burn their bodies in ovens or bury them in mass unmarked graves … then he can bring up Nuremberg. Until then he can go get a fucking shot and collect $4k or he can stfu. His comments are more than offensive."

41. This response exhibits ALPA's animus toward objectors and anyone not willing to see that monetary incentives are more important than their religious beliefs. ALPA disregarded the legitimacy of religious objections and failed to afford sincere religious beliefs the protections enshrined in our Constitution and federal law. The very group of

pilots that ALPA identified as vulnerable and assured protection were inexplicably

targeted by ALPA through LOA 21-02.

**ALPA Assisted in Implementing and Failed to Protect Plaintiff from the COVID-19 Vaccination Mandate & Accompanying Policies**

42. On August 6, 2021, United issued a unilateral COVID-19 vaccine mandate that required

all employees, including Plaintiff, to either submit proof of exemption from vaccination

requests on or before August 31, 2021, or proof of vaccination for COVID-19 prior to

September 27, 2021.

43. On August 5, 2021, ALPA promulgated a memo directing ALPA leadership to not

discuss with pilots the company's impending mandate and related policies.

44. Employees who failed to submit proof of vaccination or exemption requests by the

specified date were subject to termination.

45. In addition to the vaccine requirement, United's mandate created a number of new

working conditions imposed unilaterally and without negotiation on pilots. These

conditions included:

1. The requirement to report health data to prove one has received the COVID-19 vaccination, as a condition of employment.
2. The requirement to share private health data to an unvetted third party.
3. The creation of an extra-contractual forced leave of absence.
4. The creation of a new employee group not protected by the UPA.
5. The creation of a Return to Work policy that is impossible for the newly created employee group to monitor.
6. The creation of a discipline system with no due process afforded the unprotected pilot group.
7. Un-negotiated change in benefits of controlling who can be named your Buddy and Enrolled Friend for travel privileges.

46. Under the UPA, leaves of absences need to be elected. The company cannot force

someone to go on unpaid leave.

47. Under the mandate, employees were allowed to seek exemptions through United's reasonable accommodation process, which allowed employees to seek either a medical or a religious exemption.

48. ALPA, despite making at least eight statements or inferences to membership that a vaccine mandate is a condition of employment requiring negotiation and promising to protect members' rights[3], raised no objection to the new conditions of employment.

49. On August 25, 2021, Plaintiff submitted a signed religious exemption request. *See* Exhibit 3.

50. In his exemption request, Plaintiff stated "It is my sincerely held  conviction and religious belief that vaccination is not morally obligatory in principle and so must be voluntary, free of coercion, threatened loss of employment, or deadlines." *Id.*

51. Plaintiff further attested "it is my sincerely held conviction and religious belief that there is a moral duty to refuse the use of medical products, including certain vaccines, that are created using human cell lines derived from abortion. Babies were killed for the development, testing, and/or manufacturing of the three vaccines available. My faith convicts me to respect innocent human life from conception until natural death. I cannot

---

[3] *See* MEC-UAL's Plans and Furlough Mitigation (08/05/2020) ("The MEC remains dedicated to defending the UPA and protecting the careers of all our pilots…We have a *legal obligation* to every member, from our most senior Captain to the most junior First Officer; *we are required to consider mitigation options* for those pilots at risk of furlough…To be clear, we will *not* enter mitigation discussions which hold pilots hostage to pay rate reductions, scope concessions, or unacceptable work-rule changes."); *see* 01/25/2021 Covid Vaccines Update ("Like the population at large, **a very small number of pilots may be unable to receive the vaccine due to legitimate medical or sincerely held religious beliefs and ALPA will protect their rights**."); *see* MEC Weekly Update 01/28/2021 ("ALPA will continue to work on your behalf to protect pilot health, safety, and careers."); *see* 08/06/21 MEC: Company COVID Vaccine Requirement ("The vaccine requirement represents an employment change we believe warrants further negotiations to ensure our safety, welfare, and bargaining rights are maintained."); *see* ALPA Magazine, page 30, 09/01/21 issue ("While U.S. law doesn't prohibit companies from taking this type of action, the Association has been very clear that any vaccination requirements are an issue that must be bargained for and ultimately agreed to by each ALPA pilot group.")

in good conscience participate in or benefit from the killing of these innocent children no matter how remote the abortion took place." *Id.*

52. Plaintiff provided a detailed explanation of his religious objections to the COVID-19 vaccine and made it clear that his religious beliefs demanded that he "obey [his] conscience, God's divine law inscribed into [his] heart and soul."

53. Although his "accommodation" was granted on September 9, 2021, he was forced to either accept indefinite, unprotected, and unpaid leave of absence with no benefits, or be immediately terminated. Moreover, it was United's policy that if Mr. Oka remained on unpaid leave for more than five years, he was automatically terminated. Unpaid leave is not a reasonable accommodation, but an adverse employment action.

54. On November 11, 2021, Plaintiff lost access to all compensation and benefits provided by his position. Because of Plaintiff's exercise of his religious beliefs, he was left with no pay, no associated retirement pay, no access to sick leave pay, no company paid medical or other insurance benefits, no furlough protection benefits, no minimum pay protection guarantees, no vacation pay pro rata elimination, and no ability to access employee health savings plans which contained their contributions for an indefinite amount of time. Furthermore, Plaintiff's health care cost soared 400 percent to $2,960 per month, and he was forced to find a less expensive plan with lower benefits.

55. When United announced its mandate for its unionized pilot workforce, there was no pushback from Defendant ALPA despite it being the sole collective bargaining representative for United pilots.

56. ALPA was made aware of the policy and "accommodation" procedures by United prior to its implementation, and ALPA aided in its provisions and design.

57. ALPA failed to challenge the involuntary vaccination program's "accommodation" which violated the CBA and had a discriminatory adverse impact on members with religious objections to the COVID-19 vaccine.

58. If a policy violates the collective bargaining agreement, then ALPA has a duty to assist the affected members. Therefore, United required ALPA's assistance to employ a policy that placed pilots on unpaid leave. In essence, United needed ALPA to take the position that the mandate did not violate the contract.

59. On August 24, 2021, Oka filed a grievance alleging that United's mandatory COVID-19 vaccination requirement violated the Railway Labor Act.

60. ALPA did not assist Plaintiff with his grievance, but rather impeded the process and subjected pilots to filing and arguing their grievances themselves. However, ALPA consistently provided more support for grievances and complaints made by pilots who received medical exemptions.

61. On September 22, 2021, Oka amended his grievance to allege that the COVID-19 vaccine mandate, the "accommodation" process, and the number of adverse policies implemented as a result violated more than fifteen (15) provisions of the contract. The grievance was denied.

62. On November 16, 2021, shortly after being placed on indefinite unpaid leave with no benefits, Oka was awarded a Chicago base (ORD), Boeing-787, Captain upgrade based on his seniority.[4]  Plaintiff was not able to attend upgrade training or take advantage of this career opportunity as he was out of work on his "accommodation" furlough.

---

[4] In the airline industry, upgrades are awarded on a seniority basis. Upgrades can include 1.) bases, 2.) equipment, and 3.) seats, the combination of all three is abbreviated as (BES).  Bases are identified by an airport three letter identifier (e.g. ORD for Chicago). Equipment is identified by aircraft fleets (e.g. Boeing-787 or B787, Airbus-350 or A350). Seat is identified as Captain (CA) or First Officer (FO, co-pilot).  Oka's upgrade to ORD, B787, Captain

**ALPA Continuously Displayed Discriminatory Animus Towards Religiously Exempted Pilots**

63. ALPA executively continuously made derogatory statements, both orally and in writing, that expressed the union's disdain for pilots who sought accommodations from the mandate on religious grounds.

64. At an October 5-6, 2021, ALPA grievance training seminar, UAL-MEC Chairman Todd Insler addressed the union grievance volunteers and expressed anti-religious sentiment by mocking and deriding the convictions of the pilots who asked for religious exemptions.

65. Guam base ALPA Grievance Chairman Sean Thompson recalled and emailed to Plaintiff the following account:

> There were many things that disturbed me about Todd Insler during the Grievance training but the biggest one was when he was giving the class all the numbers on the pilots that were unvaccinated. Tallying how many of them were taking Medical RAP [religiously accommodated pilots], Religious RAP, Early Retirement, and the holdouts that would probably get fired. He then told us how many had applied for the religious Rap and how many had accepted it. He then laughed at the fact that many that had applied didn't accept the offered RAP and choose to get vaccinated once confronted with the unreasonable 5-year leave of absence accommodation. He then made a snarky comment that went something like "I guess their religious convictions weren't really all that important to them after all." And laughed again. I'm not even religious at all but it made my stomach turn thinking about the fact that he could be so callous to the convictions of other humans, let alone the pilots, that he was supposed to be protecting. His job is to protect them even if he doesn't agree with them and he clearly did not understand that in regards to this topic. He even displayed overt contempt for them and their religious beliefs.
> *See* Exhibit 4.

66. On October 7, 2021, Captain Jeff Cramer, ALPA Council 33 Chairman, was speaking to the ALPA members of Council 33 at an ALPA meeting at The View House in

---

represented a career pinnacle move that required accruing over twenty-six years of seniority. The upgrade to B787 CA is the top pay scale that Oka will ever achieve until his mandatory retirement at age sixty-five.

Centennial, Colorado. The ALPA members at the meeting were trying to get resolutions voted on that would help the pilots seeking accommodation. Captain Cramer interrupted the proceedings and said, "Listen, we are wasting an inordinate amount of time on an insignificant few," referring to the pilot group seeking exemptions, the majority of which were religious objectors.

67. On October 12, 2021, ALPA United-MEC violated its own policy manual and prevented religious exemption pilot Kathryn Klineman from speaking at the MEC meeting, driving her away. Relenting, the following day, three religious exemption pilots were permitted to speak but treated with contempt as if they were disease carriers. They were not permitted to address the council in person, but were placed in an adjacent room with a video link. ALPA also called Rosemont Public Safety, the Village of Rosement's police force, creating an intimidating presence in the building lobby.

68. In November of 2021, Marc Rathman, the current Denver Local Executive Council ("LEC") Chairman, Captain Representative and former candidate for Master Executive Council Chairman, disgustingly mocked religion and the religiously "accommodated" pilots who were holding a fundraiser. In response, Rathman wrote the following remarks in an online forum:

"To each their own…but if I had to choose, I would highly recommend steering your 'Giving Tuesday' dollars to this organization; AIRLINE EMPLOYEES for HOOKERS AND BLOW (AE4HB) For far too long we have let big government control our actions and limit our religious freedoms. We won't stand for it anymore. Our religion centers on individual gluttony and is expressly protected under the Constitution of the United States. We stand for life, liberty and the pursuit of happiness which in our case means copious consumption of cocaine and the opportunity to bang hookers. Please donate and help us out. Right now we are banned from working or airline due to a massive overreach of government and corporate America. How dare they tell hard working Americans such as ourselves, what we can and can't do with our bodies! As for the science behind these laws…it's fake news. We know of no aircrew that have both indulged in coke and subsequently banged a hooker that have then went on to crash an airplane.

Funds will be used to hire Mike Lindell as our spokesman. After his recent success with the supreme court, we believe he is the right man to front our cause. '96 hours of Hookers and Blow 2021' with Mike leading the way, will be the turning point. Thanks for your support. We are all in this together!"

"The next big concern is the FAKE non-vaxxed sperm market. It's helping drive the certified organic sperm market. Now my side gig is finally getting some serious attention!"

69. Rathman was elected to be Denver's LEC Chairman a short time after these statements were made.

70. In addition, ALPA fanned flames of irrational animus and tension toward other United pilots not wanting to fly with religiously "accommodated" pilots. Oka wrote a resolution that pilot Tammy Chebny introduced at their local council meeting in January 2022 to get furlough-fund-like assistance for religiously "accommodated" pilots' healthcare, as was the past practice. The proposal was met with angry opposition and supporters were told by Margie Freeman, the current ALPA Professional Development Committee Chairwoman, that "all religious pilots are liars and frauds and you're not taking the vaccine for political reasons, you have taken other vaccines in the past, but didn't want to take this one." Chebny then informed Freeman that she took offense at that statement, that it was against her religion, and that she was not vaccinated as a child and had not taken any vaccines to be employed at United.[5]

---

[5] Klineman was also present at that meeting and witnessed Freeman make these derisive comments about the religiously accommodated.

71. Like Rathman, Freeman was promoted to her position at some time after these statements were made.[6]

72. While out of work, Plaintiff pursued an appeal of the denied grievance to the System Board of Adjustments, which is an arbitral body made up of party representatives and a neutral arbiter. In order for the System Board of Adjustments to hear the appeal, the grievance must be presented to the Grievance Review Panel, which is an ALPA board consisting of three pilots selected by ALPA leadership. The Grievance Review Panel declined to appeal Oka's grievance to the System Board of Adjustments. Oka's denial was unfair because the Panel did not consider all of the alleged contract violations that he had included in his amended grievance.[7]

73. Houston LEC Vice Chair and First Officer Representative UAL-MEC Jamie Wright ("Wright") was told on January 17, 2024, by ALPA attorney Tom Cochran that "The reason ALPA did not help the religiously accommodated pilots was purely political." The reference was in regard to pilots that requested a religious accommodation from the COVID-19 vaccination. Wright's conversation with Cochran concerned religion and pilots requesting accommodations.

74. Anne Worster has served as the Vice Chair and First Officer Representative and the Chair and Captain Representative in ALPA Washington D.C. LEC. Worster is currently MEC Chairwoman, the highest-ranking person at United-ALPA, who replaced Garth Thompson after Todd Insler held the position. Worster admitted to Wright and others

---

[6] ALPA MEC had to approve Freeman's promotion to chair of the Pilot Professional Development Committee (including an affirmative vote by Mark Rathman). Prior to the vote on Freeman, Klineman through her local representatives, made the MEC aware of Freeman's comments and adverse position toward the religious.

[7] Oka's GRP promised him they would consider all fifteen contract violations in his amended 2021 Grievance, including a UPA Section 21-g "no discrimination" claim. Despite the promises to Oka the panel only considered one claim, UPA Section 1-a, and rendered its decision based on it alone.

that, "The religious pilots really got screwed by Todd Insler." Worster admitted that Insler communicated daily with United CEO Scott Kirby and, upon information and belief, Insler's desire to gain favor with Kirby was a motivating factor to discriminate against religious pilots who declined to get vaccinated.

75. Moreover, Worster further admitted that ALPA attorneys helped United engage in discrimination against religiously accommodated pilots, including unnecessarily harsh and disparate treatment.

76. Upon information and belief, ALPA attorneys Hansen and Eisenberg were promised jobs at ALPA national headquarters by United Airlines MEC Chairman Todd Insler, if he was elected to the position of National Chairman. However, religiously accommodated pilots actively protested and campaigned against Insler at the October 17-20, 2022, ALPA regular board of directors meeting in Las Vegas, NV. Some religiously accommodated pilots had rented a billboard truck displaying negative Insler campaign messages while other religiously accommodated pilots campaigned directly against Insler in ALPA "hospitality" suites. This had a direct impact on Insler's failure to get elected. Wright has information and belief that this protest by the religious, and Insler's failure to become ALPA National President, are additional sources of animus by Insler and ALPA attorneys against the religiously accommodated pilots at United.

77. Union leader Wendy Morse (former UAL-MEC chair, former ORD LEC Chair and Captain Representative, now First Vice-President of ALPA national) admitted that animus existed towards the religious accommodated pilots and conveyed to medically exempted pilots that they would have likely returned to work sooner had it not been for the pilots seeking religious accommodation.

78. Plaintiff filed an EEOC inquiry against ALPA on January 28, 2022, and a charge of discrimination on May 18, 2022. The EEOC on July 12, 2023 gave Plaintiff his Notice of Closure and Right to Sue letter against ALPA.

79. ALPA admitted to the EEOC that it was aware that pilots who sought medical exemptions to the mandate received better benefits than those who sought religious exemptions. To justify ALPA's preferential treatment of the medically exempt to the EEOC, ALPA intentionally labeled the medically exempt pilots as disabled and therefore were more deserving of accommodation and benefits. However, ALPA downplayed the credibility of religious objections to the COVID-19 vaccine and did not afford them the same respect.

80. ALPA's active deception toward Plaintiff and politically disfavored membership minority of religiously- "accommodated" pilots serves no statutorily legitimate purpose.

81. Although United still permitted unvaccinated passengers, unvaccinated international flight attendants, unvaccinated third-party vendors and contractors, and other carriers' unvaccinated pilot cockpit jump-seaters on the same aircraft that exempted pilots were involuntarily furloughed from, ALPA and United's policies continue to harass religiously-"accommodated" pilots, which only accounted for approximately 1.5 percent of United's workforce.

**ALPA Engaged in Disparate Treatment of Religiously Exempt Pilots**

82. Religiously accommodated pilots were subject to harsher, and more punitive policies at the hands of ALPA than pilots who objected to the vaccine on medical grounds.

83. Medically accommodated pilots kept all normal benefits except wages that they could make up for by utilizing sick leave. Access to sick leave was a benefit granted to them

and worked out through the union. Upon information and belief, Fred Greene, the Retirement and Insurance Committee Chairman at ALPA, participated in and has knowledge of this cooperation with the company.

84. ALPA came to the aid of the medically exempt and terminated pilots – but did nothing for the religiously accommodated. ALPA hypocritically gave the medically exempt pilots a "look the other way" benefit, while ignoring the plight of the religious. The medically exempt were allowed access to their sick bank in violation of the UPA and company policy. ALPA chose selective inaction that benefitted the medically accommodated and ignored the situation of the religiously "accommodated." ALPA made a determination that one group of "accommodated" would be helped – and one would not.

85. Those who sought religious exemptions were viewed by ALPA as liars and frauds. But for ALPA's animus toward the religious who requested accommodation from the COVID-19 vaccination combined with ALPA's general disfavor of the unvaccinated, Oka would have had representation in his grievances about the accommodations, career opportunities, seniority and contract enforcement. In other words, but for Oka's protected characteristic, ALPA would not have taken the adverse employment action in the form of selective action/inaction in enforcing his contractual rights.

86. United and ALPA in concert acted to treat those with religious objections seeking a religious accommodation disparately worse than their equally qualified but medically exempt pilot counterparts.

87. ALPA acquiesced in and actively facilitated the fiction that "accommodation" provided by United, as required by Title VII, was putatively and nominally characterized as "voluntary leave" authorized under the UPA 2018. However, the attributes of the "accommodation" given to employees who sought exemptions from the vaccine mandate substantively did not correspond to the voluntary leave clause of the UPA and included disparately variable features depending upon whether a pilot asserted a religious belief exemption or a medical exemption.

88. For ALPA to ignore a UPA violation that was a benefit to the "accommodated" pilots on medical grounds, and not insist on UPA enforcement for equal treatment, infers that ALPA evaluated the religiously "accommodated" pilots and their religious claims as unworthy of fair treatment and assistance.

89. ALPA intentionally differentiated between four groups of pilots: 1) vaccinated pilots, 2) unvaccinated pilots who were granted an accommodation based on medical objections, 3) unvaccinated pilots who were terminated and 4) unvaccinated pilots who were granted "accommodation" from the COVID-19 vaccine based on religious grounds. Based upon these differences ALPA determined whether pilots would receive benefits.

90. ALPA was selective in its support. For the vaccinated came monetary incentives, and all normal contract enforcement. For the medically exempt pilots, ALPA worked with and aided United to allow for them to receive the use of sick leave, health benefits, travel passes, and other privileges. For these approximately sixty-two medically accommodated pilots, ALPA did not address the improper use of sick leave. ALPA's 2020 grievance

20

opposed the use of sick leave for non-ill pilots; which cited "the company's long-standing policy that a pilot may only use sick time when actually sick."

91. For the twelve pilots who sought no exemption and were terminated, ALPA sought benefits that were greater than those of the religiously "accommodated" by filing a grievance and prayer for relief on their behalf. In this grievance ALPA petitioned for relief to have them put in what is termed, active "non-qualified status." In active "non-qualified status" a pilot keeps all their benefits except pay. The religiously "accommodated" did not have this status and its benefits. The discriminatory nature of ALPA's request was not lost on one arbitrator, who properly denied ALPA's request, stating:

> "To find that unvaccinated pilots without a religious or medical basis for refusing to be vaccinated would be treated more favorably tha[n] pilots who received a RAP accommodation and who had complied with the Company requirements for a RAP would be improper. If such an outcome were permitted, then this would mean that RAP pilots would have been better off to seek non-qualified status if it were allowed. It would be inappropriate for the Board to facilitate such an outcome as it would essentially circumvent the entire vaccination requirement process and would unfairly punish RAP pilots."

92. For Oka and other religiously accommodated pilots, ALPA did nothing. ALPA aided the company in administering benefits to the medically exempt and allowing Plaintiff and other similarly situated religiously accommodated pilots to be subject to adverse action – the loss of benefits and privileges with substantial monetary value. This discrimination was motivated by pilots' religious reasons for refusing the COVID-19 vaccine.

**Following Plaintiff's Return to United, ALPA Continued to Discriminate and Retaliated Against Plaintiff By Failing to Support Plaintiff's Grievances**

93.  Oka was returned to work on March 28th, 2022.  Oka continued to have his "accommodation" punitively modified by United under the ruse of foreign government destination restrictions.  All destinations that Oka could fly to continued having COVID-19 vaccination exemptions for flight crew, but United used the opportunity to create a punishing removal of trips-without-pay scheme for his monthly scheduling.  To Oka this harmed his scheduling ability, pay, and rightful seniority.  United created two lists of destinations; one list had destinations that were designated as "restricted" and another list designated as "prohibited." If Oka bid for or received a "restricted" destination in his schedule, United, contrary to the contract, dropped the trip without pay.  If Oka received a "prohibited" destination in his schedule, then United would drop the trip without pay and force Oka to downgrade off his Bases, Equipment and Seats (BES) upgrade. None of these provisions existed in the CBA[8] and ALPA was aware at all times of these changes. This contract-violating position that United created was a company-imposed hardship on Oka. The hardship caused Oka to give up his Captain promotion lest he be forced into a lower upgrade position by United. Oka grieved these contract violations to the union, but his cries for contract enforcement fell on deaf ears until he filed a complaint with the EEOC against his union; only then did ALPA agree to file a grievance (the 2022 Grievance). ALPA's actions were a pretense to actual relief. [9] ALPA told the EEOC that

---

[8] ALPA and United worked in concert to craft United Pilot Agreement 2023 (UPA 2023) Section 21-DD to memorialize these provisions into a new contract ratified on September 29, 2023.. Wright reported that during the September 4-7 2023, MEC meeting UAL-MEC Chairman Garth Thompson agreed with others present that UPA 2023 Section 21-DD was overly restrictive, but said that "Scott [UAL CEO Scott Kirby] needed [21-DD] because of a federal case they were involved in." ALPA is looking out for the company, not the membership they identified as vulnerable in January of 2020.

[9] After March 28, 2022, ALPA worked with United on schemes to enable United to modify pilots' "accommodations."  The resolution of ALPA Case No. 2022-U-MEC-042R, (AVOID Grievance) On March 22, 2023, is an example. ALPA reached settlement of the AVOID Grievance with the "RAP Carve-out" agreement.  The "RAP Carve-out" agreement allowed for United to, again, subject "accommodated" pilots to indefinite unpaid leave as an accommodation and orphaned them from UPA protections. Based on emails from ALPA concerning the RAP

it would press his grievance to arbitration but in the end lied, obfuscated and coerced Oka, attempting to get him to abandon his grievance. ALPA held the rightful return to Oka's ORD B-787 Captain upgrade as hostage in exchange that he fully drop the 2022 Grievance.[10]  Oka's Title VII status was known to ALPA, and "but for" this status ALPA, would have aided Oka in a prompt and proper manner. But for Oka's Title VII status, Oka would not be in discovery for an actionable claim in federal court against ALPA.

94. In addition to Plaintiff's first grievance in opposition to United's COVID-19 vaccine mandate, Plaintiff submitted a second grievance in 2022 to address the discriminatory policies applied to unvaccinated pilots who had been invited to return to their positions (2022 Grievance).

95. Following Plaintiff's return to work, ALPA continued to retaliate against Plaintiff by failing to support Plaintiff's 2022 Grievance upon Plaintiff's return to work.

96. Oka did not receive support for his grievances and was actively thwarted by ALPA in grieving contract violations.  Oka had to self-file and self-argue his 2021 Grievance before the company and union grievance review boards.

97. ALPA coerced Plaintiff in an attempt to get him to drop his 2022 Grievance.

98. In a related case initiated by Plaintiff, ALPA admitted in its Motion to Dismiss that ALPA more easily gave recognition to medically exempted pilots who raised risk of bodily injury, but dismissed the idea of injury to the immortal soul raised by those who sought a religious accommodation.

---

Carve-out and Oka's 2022 Grievance, ALPA planned to use the agreement to dispose of the Section 20 claims of his 2022 Grievance.  Another example of retaliation against Oka.

[10] Now in discovery, the subject of a DFR claim, *Oka v. United Airlines, Inc*. et al, No. 1:2023cv15793 - Document 59 (N.D. Ill. 2024)

99. In its motion, ALPA writes: "Finally, United's payment of sick leave to pilots medically barred from vaccination was logical, as United had a medical requirement that those pilots could not satisfy. Such payments do not discriminate, and it would not have helped Oka if United had not made them."[11]

100. ALPA's response in its MTD displays its own discrimination and animus against Oka as it admits that ALPA considered medical objections to the vaccine as more legitimate than religious objections.

101. Under the law, those who hold religious objections to an employment policy should be afforded the same rights to reasonable accommodation and nondiscriminatory policies as those who hold medical objections. ALPA failed to adhere to this principle.

102. Payment of sick leave was not logical, it was discriminatory. ALPA's statement confirms Oka's argument that the medically exempt are judged and evaluated differently by ALPA than the religiously accommodated.  The medically exempt are seen as having a worthy legitimate reason where the religious are not. The statement implies the religiously exempt **did** have some way to "satisfy…a medical requirement;" they simply had to go against their faith, damaging or giving up their immortal soul in order to comply with United's "medical requirement." ALPA confirmed its religious prejudice by evaluating physical contraindications to the vaccine mandate as legitimate, but considered a spiritual contraindication as a fairy tale.  In other words ALPA's statement is akin to saying that a "no hat" dress requirement could be complied with by a person who wears a hijab, all they have to do is take it off.

---

[11] *Oka v. United Airlines, Inc*. et al, No. 1:2023cv15793 - Document 49 (N.D. Ill. 2024).

103.     Additionally, ALPA writing "Such payments do not discriminate, and it would

not have helped Oka if United had not made them," displays ALPA's prejudice.  One

group exempt from the vaccine mandate was receiving benefits that the other was not.

The benefits given to the medically exempt made Oka feel as though the religiously

exempt were segregated from benefits, much like people being forced to sit in the back of

the bus who are deemed to be second-class objectors as compared to those who objected

to the vaccine on medical grounds.

104.     Withholding benefits to those who sought exemption due to their sincere religious

beliefs that are easily provided to those who sought medical exemption is the definition

of disparate treatment.

105.     Oka's facts and evidence lead to the conclusion that ALPA discriminated against

Oka not only in the lead up to United's COVID-19 vaccine mandate and policies, but also

in ALPA's response to United's new unilaterally imposed conditions of employment and

unnegotiated work rule changes the mandate created.

**FIRST CAUSE OF ACTION**
**Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.**
**Disparate Treatment**

106.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs

1-105 as if fully set forth herein.

107.     Title VII prohibits a labor union from discriminating against an individual in its

capacity as a bargaining representative for its members.

108.     Title VII applies not only to employers, but also to "labor organization[s]" such as

unions. 42 U.S.C. § 2000e-2(c). Under Title VII, it is unlawful for a labor organization:

> (1) exclude or expel from its membership, or otherwise to **discriminate against**,
> any individual because of his . . . **religion** . . . ;

25

(2) to limit, segregate, or classify its membership or applicants for membership, or **to classify** or fail or refuse to refer for employment any individual, **in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or** as an applicant for employment, **because of such individual's . . . religion** . . .; or
(3) **to cause or attempt to cause an employer to discriminate against an individual in violation of this section.**

(emphasis added).

109.    At all relevant times, Plaintiff was a pilot for United and a dues paying member of Defendant ALPA.

110.    During Plaintiff's membership with ALPA, Plaintiff was subjected to discrimination by Defendant.

111.    Plaintiff is a Christian with sincerely held religious beliefs. Due to such religious beliefs, Plaintiff is within a protected class under Title VII.

112.    During Plaintiff's membership with ALPA, ALPA limited, segregated, or classified Plaintiff in a way that deprived or tended to deprive Plaintiff of employment opportunities with United, or adversely affected Plaintiff's status at United, due to Plaintiff's sincerely held religious beliefs and religious objections to complying with United's COVID-19 vaccine mandate.

113.     Defendant ALPA caused or attempted to cause United to discriminate against Plaintiff and other pilots who sought religious objections in violation of Title VII via implementation of LOA 21-02, the mandate and accompanying policies, the accommodation process, and employment processes upon Plaintiff's return to work.

114.    Defendant ALPA not only failed to assist Plaintiff by representing him against these disparate policies, ALPA aided United to discriminate against Plaintiff and other religious objectors.

115.     ALPA disparately represented Plaintiff and other religiously-exempt employees, opting to support and protect medically exempt employees while neglecting those who sought exemptions on sincere religious grounds.

116.     ALPA intentionally and discriminatorily failed to press the grievances of religiously exempt pilots, while supporting the medically exempted by purposeful inaction and sought benefits better than the religiously exempted for the terminated pilots.

117.     ALPA continuously made derogatory remarks demonstrating their disdain and lack of respect for pilots who sought religious exemption from the mandate.

118.     Upon information and belief, ALPA provided preferential treatment to employees who sought and were granted medical exemptions for political reasons.

119.     As a direct, legal and proximate result of the discrimination, Plaintiff has sustained and will continue to sustain damages to be proven at trial.

**SECOND CAUSE OF ACTION**
**Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.**
**Religious Discrimination**

120.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-105 as if fully set forth herein.

121.     In addition to prohibiting religious discrimination at the hands of the union, Title VII also imposes on labor organizations a "duty to assist" members who suffer discrimination at the hands of their employer.

122.     A union also violates Title VII when it acquiesces to employer discrimination.

123.    Plaintiff was a qualified individual with sincerely held religious beliefs. He could perform his job duties, as he had been successfully since the first implementation of COVID-19 policies in March 2020, either with or without a reasonable accommodation.

124.    Plaintiff properly sought a religious exemption from United's COVID-19 vaccine policy due to his sincerely held religious beliefs.

125.    United subsequently placed Plaintiff on an unpaid, unprotected, and indefinite leave of absence, that was tantamount to termination without engaging in an interactive process or doing an individualized assessment of Plaintiff's circumstances. United attempted to disguise this adverse employment action as an "reasonable accommodation."

126.    But for ALPA, United could not have implemented its discriminatory policy. Without ALPA's cooperation, United could not have done what it did. ALPA aided in carrying out an adverse employment action.

127.    ALPA acquiesced to United's adverse employment action aided in United's treatment of exempted employees.

128.    ALPA had knowledge that United engaged in prohibited discrimination via implementation of its mandate and the disparate policies as applied to religious objectors.

129.    ALPA not only failed to assert objections to this discrimination, but actually worked with United to implement it.

130.    ALPA failed to oppose United's COVID-19 vaccine policy, United's illegal and non-contractual exemption policies, or United's imposition of forced unpaid leave on behalf of Plaintiff or other employees whom the Union contractually represents.

131.     Defendant ALPA had a duty to assist Plaintiff in enforcing his rights under the Collective Bargaining Agreement at the intersection at which United's so-called accommodation undoubtedly interfered with and infringed upon the terms and conditions of his employment. Similarly, ALPA had a duty to prevent United from forcing Plaintiff to go on unpaid leave.

132.     ALPA directly discriminated against Plaintiff by refusing to assist or adequately represent Plaintiff's seeking of a religious exemption from United's COVID-19 policy, and refusing to assist or represent Plaintiff in the matter of his religious "accommodation". Therefore ALPA's action directly resulted in Plaintiff being unlawfully denied religious accommodation.

133.     Moreover, Defendant ALPA caused or attempted to cause United to discriminate against Plaintiff and other pilots who sought religious objections in violation of Title VII because of his religion via implementation of LOA 21-02, the mandate and accompanying policies, the accommodation process, and employment processes upon Plaintiff's return to work.

134.     Furthermore, ALPA continuously made derogatory remarks demonstrating their disdain and lack of respect for pilots who sought religious exemption from the mandate.

135.     ALPA's failure to advocate on behalf of Plaintiff's acquisition of religious accommodation has substantially injured Plaintiff.

136.     ALPA failed to enforce the Collective Bargaining Agreement for Plaintiff and failed to address the violation of this contract by United's COVID-19 policies.

### **THIRD CAUSE OF ACTION**
### **Violation of Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.**
### **Retaliation**

137.     Plaintiff hereby incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

138.      Title VII also prohibits retaliation against an employee for engaging in protected activity and opposing an unlawful practice that is prohibited by Title VII. 42 U.S.C. § 2000e-3(a).

139.      Plaintiff engaged in protected employee activity by seeking a religious accommodation from United's COVID-19 vaccine policy and filing numerous grievances with Defendant to address the discriminatory and disparate policies applied to pilots via the vaccine mandate and employment policies enacted upon Plaintiff's return to his position.

140.     Defendant took adverse employment action by failing to press forward Plaintiff's grievances and subjecting Plaintiff to discriminatory and disparate policies upon his return to United.

141.     But for Plaintiff's religious objections to the vaccine, and his continued objections to discriminatory policies as applied to religiously exempt pilots, ALPA would have pressed forward Plaintiff's grievances.

142.     ALPA did just enough to satisfy the EEOC that it was taking action on behalf of Oka, but in the end attempted to torpedo his grievance and coerce him to drop it fully in exchange for his November 2021 seniority-awarded Captain upgrade.

143.     As a result of raising these concerns, Plaintiff was subject to punitive treatment in the form of termination, loss of benefits, and a significant delay in his promotion to Captain.

144.     There is a direct connection between Plaintiff's protected activity and Defendant's discriminatory actions.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays for the following relief:

a. For a finding that Defendant ALPA violated Title VII of the Civil Rights Act of 1964 and any other relevant statute when it engaged in religious discrimination against Plaintiff, disparately treated Plaintiff on the basis of his religion, and retaliated against Plaintiff for exercising his religious freedoms in the context of his employment;

b. An order that Plaintiff be compensated, to the extent allowable, for his monetary damages, stress and emotional upheaval;

c. An order that Defendants pay Plaintiff's costs associated with bringing this lawsuit, including his reasonable attorneys' fees and costs; and

d. A grant of any such further relief as the Court deems necessary and proper in the public interest.

DATED: September 19, 2024          Respectfully submitted,

*/s/ Sorin A. Leahu*

Sorin A. Leahu
Illinois Bar No. 6315515
LEAHU LAW GROUP, LLC
53 W. Jackson Blvd. Suite 1527
Chicago, IL 60654
(847) 529-7221
sleahu@leahulaw.com
[Local Counsel]

Lexis Anderson, Esq.
Texas Bar No. 24127016
*Subject to Admission Pro Hac Vice*
Robert E. Barnes, Esq.
California Bar No. 235919

*Subject to Admission Pro Hac Vice*
BARNES LAW
700 South Flower Street, Suite 1000
Los Angeles, California 90017
Telephone: (310) 510-6211
Email: robertbarnes@barneslawllp.com
Email: lexisanderson@barneslawllp.com

***Counsel for Plaintiff Joseph John Oka***